**TEXAS LANDOWNERS RIGHTS ASSOCIATION et al., Plaintiffs,**

v.

**Patricia Roberts HARRIS et al., Defendants.**

**Civ. A. No. 77–1962.**

United States District Court, District of Columbia.

May 31, 1978.

Charles S. Rhyne, William S. Rhyne and Richard J. Bacigalupo, Washington, D. C., for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Barrie L. Goldstein, Dennis G. Linder and Sheila Lieber, Dept. of Justice, Washington, D. C., for defendants.

WADDY, District Judge.

## MEMORANDUM OPINION

This action for declaratory and injunctive relief challenges the constitutionality of the National Flood Insurance Program (the "Program"), 42 U.S.C. §§ 4001–4128,[1] and the administrative regulations implementing the Program, 24 C.F.R. §§ 1909.1–1925.-14. Plaintiffs are the State of Missouri, 40 political subdivisions in 12 states, and 30 individual landowners and associations of landowners within federally designated

---

1. The National Flood Insurance Program is comprised of the National Flood Insurance Act of 1968, Title XIII of the HUD Act of 1968, Pub.L. No. 90–448; Title IV of the HUD Act of 1969, Pub.L. No. 91–152; the Flood Disaster Protection Act of 1973, Pub.L. No. 93–234; Section 816 of the Housing and Community Development Act of 1974, Pub.L. No. 93–383; Pub.L. No. 94–375; Title VII of Pub.L. No. 95–128; *codified at,* 42 U.S.C. §§ 4001–4128.

flood zones.[2] Defendants are the Secretary of Housing and Urban Development, who is charged with establishment and implementation of the Program, 42 U.S.C. § 4011(a), the Deputy Administrator of the Federal Insurance Administration and the Assistant Administrator for Flood Insurance. The Court has jurisdiction of this substantial federal question, without regard to the amount in controversy, pursuant to 28 U.S.C. § 1331(a).

The National Flood Insurance Program is attacked on three independent grounds: (1) The State and local governments, on their own behalf and as *parens patriae,* challenge the Program as violative of constitutional principles of federalism and state sovereignty under the Tenth Amendment. (2) Plaintiff landowners and landowner organizations contend that the Program constitutes a taking of their land without the payment of just compensation as required by the Fifth and Fourteenth Amendments. (3) All plaintiffs claim that the Program provides inadequate due process protections and that it is an irrational exercise of Congressional power under the Fifth and Fourteenth Amendments.

The Court previously heard and, ruling from the bench, denied plaintiffs' Motion for Preliminary Injunction.[3] At the conclusion of that hearing the parties agreed that no real questions of fact were in dispute and that this action involved strictly legal propositions. Consequently, this case is now before the Court on the parties' cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*The National Flood Insurance Program*

In August 1968, the National Flood Insurance Act of 1968 was enacted as Title XIII of the Housing and Urban Development Act of 1968.[4] Administered by the Department of Housing and Urban Development (HUD), the Program is a federally subsidized plan to protect property owners, and the United States, against flood damage resulting in ". . . personal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's resources . . .." 42 U.S.C. § 4001(a)(1). As a condition of eligibility for government supported flood insurance, the 1968 Act required HUD designated flood-prone communities to adopt local flood plain management measures to reduce or avoid flood damage. 42 U.S.C. §§ 4022, 4102.

The availability of subsidized flood insurance under the National Flood Insurance Act of 1968 did not, by itself, provide sufficient incentive to attract extensive local community enrollment in the Program. *See* S.Rep. No. 93–583, 93d Cong., 1st Sess. 4, *reprinted in* [1973] U.S. Code Cong. & Admin. News pp. 3217, 3220 (Senate Report). Finding a strong public policy favoring participation in a flood insurance plan of national scope, 42 U.S.C. § 4002(a)(5), in December 1973, Congress passed the Flood Disaster Protection Act of 1973.[5] The 1973 Act sought to significantly enhance the attractiveness of enrollment in the Program through a dual scheme of sanctions against both non-participating communities, as a whole, and against flood-prone designated property located in an area which is eligible for and participating in the Flood Insurance Program, but which is not covered by flood insurance.

Section 202 of the 1973 Act, as originally enacted, denied both federal financial assistance for acquisition or construction pur-

---

2. Paragraphs 15–17 of the Complaint set forth class action allegations. However, plaintiffs have not moved for certification of the class pursuant to Rule 23 of the Federal Rules of Civil Procedure or Rule 1–13(b) of the Rules of the United States District Court for the District of Columbia.

3. Transcript of proceedings on plaintiffs' Motion for a Preliminary Injunction, filed Jan. 19, 1978, at 49–52.

4. Pub.L. No. 90–448, Title XIII, 82 Stat. 476.

5. Pub.L. No. 93–234, 87 Stat. 975.

poses [6] and federally-related financing by private lending institutions [7] for use in HUD designated flood-prone localities, unless the community in which the property is situated participated in the Program. This Section was amended by Section 703 of the Housing and Community Development Act of 1977 [8] to remove the prohibition against the extension of financing by federally supervised private lending institutions in flood hazard areas of non-participating communities. The amendment left untouched the direct federal assistance sanctions which extend to direct federal grant aid as well as to FHA and VA home mortgages.

Section 102 of the 1973 Act, the counterpart of Section 202 applied to property located in participating communities where flood insurance is available under the Program, denies both direct federal financial assistance [9] and federally-related financing by private lending institutions [10] for acquisition or construction purposes, unless the property is covered by flood insurance.

In sum, Congress has mandated that in order to protect the nation's investment in property that is situated in a known hazardous area, the community in which that property is located must participate in the Program to be eligible for federal assistance, and further, that property located in a participating community must be covered by flood insurance not only to be eligible for direct federal assistance, but also to receive mortgage money from a federally supervised private institution. See Senate Report at 10. Acceptance into the Program is, of course, contingent upon the community's adoption of local flood plain management efforts consistent with HUD promulgated guidelines.

### Tenth Amendment Challenge

The State and local government plaintiffs claim that the National Flood Insurance Program violates their sovereign powers and the principles of federalism embodied in the Tenth Amendment to the Constitution, which declares that:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

Those plaintiffs specifically complain of a loss of control over the traditionally local governmental function of regulating the community's land use; the cost of administering and enforcing the federally approved zoning regulations required for acceptance into the Program; and the loss to the local tax base resulting from a decline in the community's property values when Program sanctions attach.

While they recognize that the federal government may impose various conditions and terms upon the receipt of federal benefits by the states, plaintiffs contend that in this instance Congress overstepped the Tenth Amendment limitations on its power. They argue that the National Flood Insurance Act of 1968 presented the local governments with the usual choice between complying with the federal conditions and accepting the benefits of the Program, or not adopting the federal standards and foregoing the benefits, but that the broadened sanctions of the Flood Disaster Protection Act of 1973 changed the Program into a mandatory enactment which encroaches

6. Section 202(a) of the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4106(a).

7. Section 202(b) of the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4106(b), *before amendment by* the Housing and Community Development Act of 1977, § 703, Pub.L. No. 95–128, 91 Stat. 1111.

8. Pub.L. No. 95–128, § 703, 91 Stat. 1111 (*codified at* 42 U.S.C. § 4106(b), *as amended.*) Amended Section 202(b) is now merely a notice provision requiring lenders to inform borrowers whether or not their properties would be eligible for federal disaster relief assistance in the event of a flood. Conventional mortgage money is again available, as usual, to a community under Section 202 sanctions.

9. Section 102(a) of the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4012a(a).

10. Section 102(b) of the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4012a(b).

upon heretofore traditional areas of local sovereignty.[11]

In response to the Court's questions at the hearing, plaintiffs conceded that on its face the Program *does* appear to present a participation option.[12] However, it is urged that this apparent option is only illusory, and that the threat of Sections 102 and 202 sanctions against non-participants results in a Hobson's choice. Plaintiffs contend that this is not the typical symbiotic program where the localities are free to either take or leave the federal benefit. Here, they claim, the local communities lose more by not accepting the Program than they would stand to gain by complying with the national flood plain standards and purchasing federal flood insurance. Plaintiffs conclude that the effective mandatory nature of the Program contravenes the Tenth Amendment. In support of this proposition they rely primarily upon *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) and *District of Columbia v. Train,* 172 U.S.App.D.C. 311, 521 F.2d 971 (1975).

Defendants characterize the National Flood Insurance Program as a traditional federal benefit program. They reject plaintiffs' "host of horribles" and maintain that the Program is a constitutional exercise of the Tax and Spend, or, General Welfare Clause of the Constitution in favor of the welfare of the nation and its citizenry, Article I, Section 8, Clause 1. That clause provides that:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; . . .

The government defendants find *National League of Cities* and *District of Columbia v. Train* inapposite to this case as each of those decisions considered federal programs promulgated pursuant to the exclusive power of the Congress under Article I, Section 8, Clause 3, of the Constitution "[t]o regulate Commerce . . . among the several States." They also suggest that *National League of Cities* is inapplicable since there the Court found a Tenth Amendment bar to *direct* federal intrusion into the States' freedom to control their governmental functions, while here there is only an indirect involvement in such activities when, and if, the States choose to partake of federal flood insurance. Defendants specifically rely upon an unpublished three-judge court decision in *North Carolina v. Califano,* 445 F.Supp. 532 (E.D.N.C., filed Sept. 22, 1977), aff'd mem., —— U.S. ——, 98 S.Ct. 1597, 56 L.Ed.2d 54 (1978).

There is no question that "[t]he offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual." *Oklahoma v. Civil Service Comm'n.,* 330 U.S. 127, 144, 67 S.Ct. 544, 554, 91 L.Ed. 794 (1947). At issue here is whether federal sanctions against non-cooperating states may be found so severe that an otherwise optional federal benefit program may fall within the recently announced rule of *National League of Cities.*

In *National League of Cities* the Supreme Court declared that amendments to the Fair Labor Standards Act which sought to extend the Act's minimum wage and maximum hour provisions to employees of the States and their political subdivisions exceeded Congress' Commerce Clause authority. The Court, in that 5–4 decision, was careful to point out that the challenged provisions " . . . operate to *directly displace* the States' freedom to structure integral operations in areas of traditional governmental functions . . . " 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (Emphasis added.) The Opinion explains that the Act's amendments imposed certain requirements directly upon the

---

**11.** Plaintiffs do not seek to have the entire Program struck down as unconstitutional. They would like a return to the Program as it existed under the 1968 Act, before the 1973 amendments.

**12.** Transcript of proceedings on cross-motions for summary judgment, filed May 31, 1978, at 6.

States, as States, and that no discretion remained with the States in implementing those requirements. At 847–8, 96 S.Ct. 2465.

Here, both sides have joined in aptly characterizing the Program as presenting the States and their political subdivisions with "a carrot and a stick" inducement. Plaintiffs allege that the stick is especially onerous because the Program does not provide much of a benefit. They appear to invite the Court to engage in a balancing test wherein the severity of the sanctions can offset the discretion left with the States. The resulting Hobson's choice, plaintiffs argue, must be equated with a complete absence of choice.

■ First, the General Welfare Clause, Art. I, § 8, cl. 1, is not a limitation upon congressional power, but, rather, " . . . a grant of power, the scope of which is quite expansive . . . " *Buckley v. Valeo*, 424 U.S. 1, 90, 96 S.Ct. 612, 668, 46 L.Ed.2d 659 (1976). "Nor is the concept of the general welfare static. Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation. What is critical or urgent changes with the times." *Helvering v. Davis,* 301 U.S. 619, 641, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937).[13] In this connection, Congress has been particularly attentive to setting forth the forces which, in its view, require a national plan for flood insurance. 42 U.S.C. §§ 4001, 4002. *See* Senate Report at 2–4.

Second, the suggestion of testing federal coercion upon the States through a balancing process has long been rejected. *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed.2d 1279 (1937) considered the validity of the tax imposed by the Social Security Act of 1935 in the face of a challenge that the tax was, *inter alia*, " . . . an unlawful invasion of the reserved powers of the states; and that the

states in submitting to it have yielded to coercion and have abandoned governmental functions which they are not permitted to surrender." 301 U.S. at 578, 57 S.Ct. at 887.

Justice Cardozo, writing for the Court, explained that temptation on the part of a State to comply with a condition attached to a federal benefit is not to be equated with federal coercion upon the State. To do so would " . . . plunge the law in endless difficulties." *Steward* at 589–590, 57 S.Ct. at 892. The *Steward* Court declared a general rule that when a legitimately national purpose is addressed by the Congress, the inducement offered for state compliance does not exceed the tax and spend powers delegated to the national government. At 590–591, 57 S.Ct. 883.

■ Similarly, here plaintiffs offer the Court an opportunity to measure the potential local benefits of flood insurance against the costs of participation to local sovereignty and pocketbooks. Yet, for the courts to take it upon themselves to strike the balance and to draw the line in a choice which Congress has left for the States would be to involve the judiciary in the same dangerous weighing process that Justice Cardozo cautioned against over forty years ago.

The Court concurs with the parties that the National Flood Insurance Program is a carrot and stick scheme. Quite clearly, then, the Program is one which offers certain inducements for state participation, rather than one which, along the lines of the Fair Labor Standards Act amendments in *National League of Cities*, mandates local compliance with a discretion-less federal enactment. Accordingly, the Court finds *National League of Cities* does not compel a determination that the Program violates the Tenth Amendment. And, in the absence of a direct intrusion upon state sovereignty, the Court will abide by the wise rule of *Steward* to leave the choice between accepting or rejecting federal benefit programs with the States.

**13.** Justice Holmes, writing for the Court in *Missouri v. Holland*, 252 U.S. 416, 433, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920), commented that, " . . . [W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters."

This conclusion does not ignore our Circuit's decision in *District of Columbia v. Train*, 172 U.S.App.D.C. 311, 521 F.2d 971 (1975). In *Train* the Court of Appeals struck down certain Clean Air Act regulations which required *unconsenting* states to enact, administer and enforce Environmental Protection Agency programs. At the same time, however, the Court included in a footnote the following description of the manner in which the federal government usually attracts voluntary state compliance: "The federal government traditionally obtains state cooperation and participation in federal regulatory programs by offering the states a sufficiently attractive incentive *or by threatening to withdraw a federal benefit they are presently receiving.*" 172 U.S.App.D.C. at 333, 521 F.2d at 993, n. 26. (Emphasis added.) This is precisely how Congress has chosen to proceed in providing national flood insurance for the general welfare of the Nation. *See Friends of the Earth v. Carey*, 552 F.2d 25, 36-7 (2d Cir. 1977).

Chief Justice Marshall, describing the federal commerce power, " . . . made emphatic the embracing and penetrating nature of this power by warning that effective restraints on its exercise must proceed from political rather than from judicial processes." *Wickard v. Filburn*, 317 U.S. 111, 120, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942). (Citation omitted.) The judicial process provides no more of a forum for restraint on the Welfare Clause powers of Congress when, as here, the plaintiffs' attack is directed towards a statutory condition which is not mandatory but is left in the hands of the State.

### Fifth and Fourteenth Amendment Claims
#### Taking Without Compensation

The landowner and landowner organization plaintiffs contend that the National Flood Insurance Program constitutes a taking of their land without the payment of just compensation as required by the Fifth and Fourteenth Amendments to the Constitution. They argue that when Section 102 or 202 sanctions are applied against individual property owners or entire local communities, respectively, for non-participation in the Program, the value of their land is so drastically diminished that a "taking" must be found. The diminution in property value, it is alleged, flows from the unavailability of direct federal financial assistance and, under Section 102(b) of the Program, private institutional financing for the purposes of acquisition or construction in connection with uninsured property. These plaintiffs also contend that the federally mandated restrictions on their land use due to Program participation constitute a taking.

The defendants maintain that a Fifth Amendment taking may be found only when the property in question has been directly appropriated by the federal governmental, or when federal action wholly deprives the property of its current usage and renders it valueless. Here there has been no direct governmental appropriation, and, defendants contend, no showing that the land or property has been made worthless and useless.

HUD's Office of Flood Insurance, Federal Insurance Administration, in conformance with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, has filed an Environmental Impact Statement on the Program which plaintiffs have attached as Exhibit D to their Complaint. It was considered in preparing the EIS that "[i]f a community chooses not to participate in the Program, economic development in the flood hazard area may be severely restricted." Exhibit D at 63. The Congress has also considered the impact of its admittedly costly sanctions, but in weighing the merits of flood insurance against those costs has decided the sanctions are "eminently fair and reasonable". *See* Senate Report at 9–11, 18–20.

One test for a taking of property without due process of law is one of reasonableness. *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). When the government acts to protect the safety and welfare of the community, generally no taking or appropriation is found. *Goldblatt* at 593, 82 S.Ct. 987. Only unrea-

sonable measures will usually be held to constitute a taking. *Hadacheck v. Sebastian*, 239 U.S. 394, 398, 36 S.Ct. 143, 60 L.Ed. 348 (1915), *see Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).

■ In *Hadacheck* the Court did not find a Fifth Amendment taking even though there was shown to be a 93% diminution in property value. As a matter of policy the Court has been reluctant to find governmental takings where the action challenged is shown to be related to a legitimate public interest. *See Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1927), *Euclid v. Ambler Realty*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), *Reinman v. City of Little Rock*, 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900 (1915). In *Ambler Realty* the Court instructed that " . . . while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise." 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303.

Here, plaintiffs do not allege that their land has become useless. Presumably, the land, insured or not, may be put to some purposes, though the choices may be somewhat more limited when the property is covered by flood-plain land use restrictions. Plaintiffs do allege that the Program sanctions operate to make their land close to valueless.

The government defendants respond that land values are not being diminished, but that the true value of flood-plain land is finally being ascertained for the first time, *i. e.*, the risks of such ownership are for the first time reflected by the market.

While the defendants' proposition carries a certain appeal, the Court cannot ignore

the fact that purchasers in the realty market have always been capable of calculating the flood risk into their agreed purchase price. At least some portion of the decreased property value for flood-zone land must be attributed to unavailability of certain conventional avenues of financial assistance and mortgage money which dry up under Program sanctions.

Thus, this case turns upon the usual balancing test of social policy and public interest versus the rights of a landowner to be unencumbered in the use of his property. It is the Court's opinion that here the scales tip in favor of the public interest. The public safety, health and general welfare favor the Program. There is involved a legitimate national goal. One aspect of that goal is to equitably spread the costs of flood disasters among those landowners who most benefit from publicly funded flood disaster relief. This appears to be exactly what is happening, and, as discussed at the outset of this section, a result well within the contemplation of both the Congress and the Department of Housing and Urban Development.[14] Accordingly, the Court concludes that the Program does not constitute a taking without the payment of just compensation.

### Due Process

■ All plaintiffs allege that the Program provides inadequate due process protections and that it is an irrational exercise of Congressional power under the Fifth and Fourteenth Amendments to the Constitution.

However, the Program appears to fit well within the quasi-legislative decision making process approved by this Circuit in *American Airlines, Inc. v. Civil Aeronautics Board*, 123 U.S.App.D.C. 310, 319, 359 F.2d

---

14. One result of the Program, according to plaintiffs' representations at the hearing, has been that property owners who find themselves saddled with Section 202 sanctions due to their communities' non-participation in the Program have been lobbying and threatening legal action against their local officials in an effort to compel flood insurance eligibility. Therefore, it

is the local citizens, rather than the federal government, who appear to be supplying at least part of the clout necessary to exact community participation, which plaintiffs claim results in an unconstitutional taking. Transcript filed Jan. 19, 1978, at 8–9; Transcript filed May 31, 1978, at 3–6.

624, 633 (1966). Moreover, there is some question as to whether plaintiffs have succeeded in stating a claim for a due process deprivation of property. Once again the question revolves around the effects of Program sanctions. It must be remembered that the federal government does not hold a monopoly on home financing and mortgages. There are still private insurers and savings associations which, albeit limited in supply, may contract with plaintiffs for construction or acquisition funds in flood hazard areas. Even though the federal benefit is clearly more attractive, alternative sources of money are not completely abrogated. *Cf. United States v. Kras*, 409 U.S. 434, 445, 93 S.Ct. 631, 34 L.Ed.2d 626 (1975). Thus, whatever deprivation of property may result from the Program must be considered insubstantial when balanced against the procedures provided for protecting that interest.

The Court has already considered and rejected the contention that the National Flood Insurance Program is an irrational exercise of Congress' powers. The federal legislature has been delegated the necessary power under Art. I, § 8, cl. 1, of the Constitution. The exercise of that power through this Program appears reasonable and rationally related to the legitimate national goal of protecting property owners, and the United States, against flood damage resulting in " . . . personal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's resources . . . ." 42 U.S.C. § 4001(a)(1). Therefore, plaintiffs' due process claims under the Fifth and Fourteenth Amendments will be denied.

### Conclusion

Accordingly, there being no material facts in dispute, and defendants being entitled to judgment as a matter of law, their Motion for Summary Judgment will be granted, and plaintiffs' cross-motion will be denied.